**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| FIDC, L.L.C., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    **Case No. 4:25-cv-00554-SEP** |
| | )    **JURY TRIAL DEMANDED** |
| SECURA INSURANCE COMPANY, | ) |
| | ) |
|     Defendant. | ) |

**PLAINTIFF'S AMENDED AND MASTER COMPLAINT**

COMES NOW the Plaintiff FIDC, L.L.C., by and through counsel, and for its Amended and Master Complaint against Defendant Secura Insurance Company, as follows:

**PARTIES, VENUE, & JURISDICTION**

1.    Plaintiff FIDC, L.L.C., ("Plaintiff") is a limited liability company formed under the laws of the State of Missouri, with its principal office also located in Missouri. Plaintiff consists of a single member, who is a resident and citizen of the State of Missouri.

2.    Plaintiff is the owner of the commercial property located at and around 6740-6746 Romiss Court, Saint Louis, Missouri (the "Insured Premises"), which is covered by the Policies (defined below).

3.    Defendant, Secura Insurance Company ("Defendant"), is an insurance company organized and existing under the laws of the State of Wisconsin with its principal place of business located in Wisconsin.  Defendant is licensed to, and does conduct, insurance business in the State of Missouri, including Saint Louis County.

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen of Missouri, and Defendant is a citizen of Wisconsin.

5.      The total amount in controversy is at least $1,478,293.81, as set forth below:

    a.      Damages related to the 2024 Loss (as defined below): $297,341.71;

    b.      Damages related to the 2025 Loss (as defined below): $1,478,293.81.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Insured Premises is situated in this District, and the events giving rise to the claims upon which this suit is based occurred in this District.

## GENERAL ALLEGATIONS

### The Insurance Policies

7.      At all times relevant hereto, Plaintiff was insured pursuant to successive insurance policies issued by Defendant that provided coverage for property damage to the Insured Premises.

8.      The 2023-2024 Policy: For the policy period of September 30, 2023 through September 30, 2024, Defendant issued to Plaintiff a commercial property insurance policy, bearing Policy No. 20-CP-003154747-13 (the "First Policy"). A true and correct copy of the First Policy is attached as ***Exhibit 1***.

9.      The 2024-2025 Policy: For the policy period of September 30, 2024 through September 30, 2025, Defendant issued to Plaintiff a successor commercial property insurance policy, bearing Policy No. 20-CP-003154747-14 (the "Second Policy"). A true and correct copy of the Second Policy is attached as ***Exhibit 2***.

2

10.     The First Policy and Second Policy are sometimes hereafter collectively referred to as the "Policies."

11.     Both Policies provided insurance coverage for direct physical loss of or damage to the Insured Premises. Both Policies are "all risks" policies, which means they provide insurance coverage for all direct physical loss of or damage to covered property within the respective policy periods, except as specifically excluded or limited by the Policies.

12.     Both Policies provide coverage for hail and wind damage.

13.     Both Policies provided coverage on a replacement cost valuation basis, which means that coverage is provided on a replacement cost basis without deduction for depreciation.

14.     The First Policy provided a limit of insurance coverage for the Insured Premises in the amount of $6,800,000.00, with a deductible of $5,000.00 for hail damage.

15.     The Second Policy provided a limit of insurance coverage for the Insured Premises in the amount of $7,344,000.00, with a deductible of $146,880.00 for hail and/or wind damage.

16.     Pursuant to both Policies, Plaintiff paid premiums to Defendant in exchange for insurance coverage.

17.     Plaintiff paid all required premiums at all times relevant to this Amended and Master Complaint.

The Insured Premises

18.     The Insured Premises serves as a commercial storage, distribution, and manufacturing facility.  The walls are CMU (concrete masonry units) on a concrete slab.  The primary and main roofing system is a built-up roof.  There is also a smaller metal structure with a metal panel roofing system.  Both roof systems are show in the picture below:

3



19.    As seen in the above picture, the built-up roof covers most of the Insured Premises. A built-up roof is a low sloped roofing system that is commonly referred to as a BUR. The BUR roofing system on the Insured Premises consists of 4 ply built up roof that is installed by alternating layers of reinforcing felt (fiberglass or organic) with hot asphalt (bitumen) over insulation and a cover board. The process involves mopping or spraying hot bitumen to create a seamless, waterproof membrane, finished with a top surfacing layer of gravel, mineral cap sheet, or coating for UV protection. On top of the BUR, a flood coat was applied, which is a heavy, top layer of hot bitumen poured over the final ply sheet to act as both a protective, waterproof seal and as an adhesive. Below the BUR, the substrate includes insulation and a cover board. Below the substrate, the roof deck is metal.

20. Around the perimeter of the BUR roof is a parapet wall that is covered with modified bitumen.

The 2024 Loss

21. On about May 26, 2024, April 1, 2024, and/or at other times during the term of the First Policy, severe storm events involving large hail struck the Insured Premises, causing damage (the "2024 Loss").

22. As a result of the 2024 Loss, the Insured Premises suffered direct physical loss, including, but not limited to, damages to the roof and other exterior components. Specifically, hail strikes from the 2024 Loss damaged the flood coat on top of the BUR roofing system, but neither penetrated the flood coat nor allowed water intrusion into the roofing system.

23. The proper repair methodology for the hail damage from the 2024 Loss to the BUR roofing system is limited to removal and replacement of the flood coat. Additional damage from the 2024 Loss included hail damage to the parapet cap, rooftop metal appurtenances, overhead doors, exterior metal vents, downspouts/gutters, and metal roofing.

24. The damage from the 2024 Loss was visible to the naked eye and was clearly caused by hail impacts.

25. The First Policy was in effect at the time of the 2024 Loss, and there is no applicable exclusion or limitation that would preclude coverage.

Defendant's Investigation and Partial Payment for the 2024 Loss

26. Plaintiff promptly notified Defendant of the 2024 Loss.

27. Defendant accepted the 2024 Loss as a covered claim and assigned claim number C0171080.

28. Defendant retained Apex Claims Management ("Apex") to inspect the Insured Premises for hail damage on or about July 15, 2024.

29. After Apex inspected the Insured Premises, Defendant retained Nederveld Engineering ("Nederveld") to conduct a second inspection of the Insured Premises on or about July 24, 2024.

30. Nederveld issued a report dated August 6, 2024 that confirmed hail of 1.0 inches or greater impacted the Insured Premises during the term of the First Policy.

31. Although Nederveld confirmed that hail fell at the Insured Premises during the policy period, Nederveld opined that the roof was not significantly damaged by hail. Nederveld, however, did confirm that the 2024 Loss may have damaged eight metal flue caps and a portion of the gutters at the Insured Premises.

32. Nederveld took photos during its inspection on behalf of Defendant of the BUR roofing system and exterior components of the Insured Premises.

33. Defendant then retained Aggregate Construction Consultants ("Aggregate") on or about August 23, 2024 for the purpose of preparing an estimate consistent with the damage acknowledged by Nederveld.

34. Aggregate provided an estimate of $31,879.79 (replacement cost value) and $19,743.57 (actual cash value) for repairs to HVAC units, flue caps, metal roofing, gutters, and a portion of the built-up roof, among other things.

35. Defendant accepted Plaintiff's claim as compensable and issued payment in the amount of $14,743.57 (the actual cash value of Aggregate's estimate, less the $5,000.00 deductible).

6

36.    Defendant's valuation of the 2024 Loss was significantly less than the actual amount of loss incurred to the Insured Premises. Defendant's valuation failed to include all of the hail-caused damage to the Insured Premises.

<u>Plaintiff's Expert Assessment of the 2024 Loss</u>

37.    Plaintiff engaged a licensed professional engineer, Steve Prosser, P.E., of Prosser & Associates, to independently inspect the Insured Premises. Mr. Prosser took photographs of the exterior components of the Insured Premises during his inspection.

38.    Mr. Prosser issued a detailed engineering report dated February 10, 2025, confirming that the 2024 Loss damaged the Insured Premises more extensively than acknowledged by Defendant.

39.    Mr. Prosser's report documented that the 2024 storm damage necessitated, among other things, removal and replacement of the roof's flood coat and multiple other repairs.

40.    Specifically, Mr. Prosser determined that hail from the 2024 Loss had caused the following damage, without limitation:

a.    Hail damage to the flood coat on top of the BUR roofing system without penetration through the flood coat and without moisture intrusion;

b.    Hail damage to the modified bitumen on the parapet cap; and

c.    Hail damage to various metal components on the exterior of the Insured Premises, including the small metal roof, rooftop appurtenances, such as vents, doors, and gutters, to name a few.

41.    Mr. Prosser documented and quantified the widespread nature of the hail damage to the BUR roofing system from the 2024 Loss by performing test squares, which are 10-foot by 10-foot (100 sq ft) areas marked on a roof slope to analyze through representative testing the

number of hail impacts that caused damage to the roofing system. A standard test square inspection involves counting individual hail strikes within the square.

42.    Mr. Prosser performed twelve (12) test squares on the BUR roofing system and determined that there was hail damage ranging from 33 hits per square to 50 hits per square in the various test squares.

43.    Mr. Prosser also documented fifteen (15) damaging hail strikes to the modified bitumen on the parapet cap during his inspection.

44.    Based on his investigation, Mr. Prosser recommended the following corrective actions as a result of the 2024 Loss:

a.    Replacement of the flood coat on the BUR roofing system;

b.    Replacement of the modified bitumen membrane parapet cap;

c.    Replacement of any metal parapet flashing;

d.    Replacement of all rooftop light gauge metal appurtenances;

e.    Replacement of damaged overhead doors;

f.    Replacement of downspouts; and

g.    Replacement of the metal panel roofing system.

45.    Following Mr. Prosser's report and the corrective actions identified therein, Plaintiff engaged a building consultant, Mr. Justin Willits of Mavin Consulting, to provide an estimate of the amount of loss from the 2024 Loss.

46.    Mr. Willits issued an estimate using date of loss pricing, and based upon the corrective actions provided by Mr. Prosser, to perform the necessary work to repair/replace the damages from the 2024 Loss in the amount of $314,338.56 (replacement cost value) and $276,306.23 (actual cash value).

47.    Plaintiff provided Mr. Prosser's engineering report and Mr. Willits' estimate to Defendant via letter dated March 18, 2025.

48.    Defendant never responded to Plaintiff's submission.

49.    Based on Mr. Willits' estimate of $314,338.56, less the First Policy's $5,000.00 deductible and Defendant's $14,743.57 partial payment, the damages attributable to the 2024 Loss are in excess of $75,000.00.

50.    As pricing increases over time due to inflation (among other factors), the amount of the repair cost for said corrective actions may increase.

51.    Plaintiff cannot make the necessary repairs without the insurance benefits, and Defendant's refusal to issue payment for same has prevented Plaintiff from making the necessary repairs.

The 2025 Loss

52.    On or about May 19, 2025, a separate and distinct severe storm event involving large hail and strong winds struck the Insured Premises, causing additional, distinct, and different damage to the Insured Premises (the "2025 Loss").

53.    The 2025 Loss was a separate covered occurrence under the Second Policy, which was in effect from September 30, 2024 through September 30, 2025.

54.    As a result of the 2025 Loss, the Insured Premises suffered direct physical loss that was distinct from and in addition to any damage from the 2024 Loss.

55.    With respect to the BUR roofing system, the hail strikes from the 2025 Loss penetrated the flood coating and all plies of the BUR.  This damage was widespread and dispersed throughout the entirety of BUR.  The hail from the 2025 Loss also caused damage to the various

metal components on the exterior of the Insured Premise, and wind associated with the 2025 Loss caused the modified bitumen on the parapet cap to uplift and disengage.

56.    The damage from the 2025 Loss was visible to the naked eye and was clearly caused by hail and wind.

57.    The damage from the 2025 Loss was not present in the photographs taken by Nederveld and Prosser, as well as additional individuals, after the 2024 Loss and before the 2025 Loss.

58.    The Second Policy was in effect at the time of the 2025 Loss, and there is no applicable exclusion or limitation that would preclude coverage.

<u>Defendant's Investigation and Denial of the 2025 Loss</u>

59.    Plaintiff promptly notified Defendant of the 2025 Loss.

60.    Defendant assigned claim number C0189652 to the 2025 Loss claim.

61.    Defendant retained Nederveld Forensic Engineering to inspect the Insured Premises for hail and/or wind damage on or about September 29, 2025.

62.    Nederveld issued a report dated October 8, 2025 (the "Nederveld Initial Report") that confirmed hail had recently fallen at the Insured Premises and that hail of up to 1.25 inches may have impacted the Insured Premises during the term of the Second Policy.

63.    Despite confirming that hail may have fallen at the Insured Premises during the Second Policy period, Nederveld opined in the Nederveld Initial Report that the Insured Premises' roof was not damaged by the 2025 Loss.

64.    Following the 2025 Loss, Plaintiff again engaged licensed professional engineer Steve Prosser to inspect the Insured Premises.

65.     Mr. Prosser issued a detailed engineering report dated December 1, 2025, which confirmed that hail and wind damaged the Insured Premises during the 2025 Loss.

66.     During his 2025 inspection of the Insured Premises, Mr. Prosser determined that the entire BUR roofing system had been damaged by hail strikes from the 2025 Loss and that this damage was distinct and identifiable from the damage associated with the 2024 Loss.  The hail strikes to the BUR associated with the 2025 Loss "manifested as punctures and openings, depressions, and bruising in the BUR system.  The hail strikes penetrated the flood coating and all plies of the BUR system.  These damage modes were widely prevalent and dispersed over the entirety of the roof."

67.     In order to quantify the hail damage to the BUR from the 2025 Loss, Mr. Prosser once again undertook the process of completing test squares, performing five (5) test squares.  The results of these test squares ranged from 15 to 18 incidents of hail damage from the 2025 Loss.

68.     With regard to the 2025 Loss test squares, Mr. Prosser wrote that "[a]ll of the above hail strike damage modes are new and penetrated the flood coat and plies of the BUR roofing system.  The counts are not inclusive of the hail strikes to the flood coat as previously identified during the 11/06/24 inspection.  Instead, the counts identified in the table above, include only new hail strike damages that did not previously exist and which completely penetrated the flood coat and damaged the plies of the BUR roofing system."

69.     Mr. Prosser also determined that hail strikes from the 2025 Loss had caused additional damage to the modified bitumen on the parapet cap, along with wind damage.

70.     Based on the damage from the 2025 Loss causing punctures through the BUR roofing system, core samples were taken to determine the make-up of the roofing system and check

11

for moisture intrusion into the roofing system from the 2025 Loss.  The core samples showed moisture intrusion through the BUR roofing system into the substrate as a result of the 2025 Loss.

71.    Based on the damage from the 2025 Loss, Mr. Prosser provided revised corrective actions.  While the damage from the 2024 Loss only required removal and replacement of the flood coat on top of the BUR roofing system, the new and distinct damage from the 2025 Loss now requires that the BUR roofing system be removed down to the deck and replaced.

72.    Plaintiff provided Mr. Prosser's December 1, 2025 engineering report to Defendant via email dated December 2, 2025.

73.    In response to Mr. Prosser's engineering report, Defendant directed Nederveld to issue a supplemental report dated December 16, 2025 (the "Nederveld Supplemental Report").

74.    The Nederveld Supplemental Report confirmed that a hailstorm with up to 1.25-inch hail occurred at the Insured Premises on May 19, 2025.

75.    Despite this confirmation, Nederveld maintained its position that the roof was not damaged by the 2025 Loss.

Plaintiff's Expert Assessment of the 2025 Loss

76.    Based on Mr. Prosser's December 1, 2025 Report and the corrective actions identified therein, Plaintiff requested that Magnus Construction ("Magnus"), a licensed contractor, provide an estimate of the amount of loss for the 2025 Loss.

77.    Magnus issued an estimate dated August 14, 2025, quantifying the damages from the 2025 Loss in the amount of $1,625,173.81 (replacement cost value).  The Magnus Estimate deals with the cost to remove and replace the BUR roofing system down to the deck and work related thereto, omitting exterior doors and the metal roofing system completely.

78.     On October 21, 2025, based on Magnus' estimate, Plaintiff executed a Sworn Statement in Proof of Loss with regard to the 2025 Loss claiming damages totaling $1,625,173.81 (replacement cost value), less deductible, depreciation, and subject to any applicable limits (the "Proof of Loss").

79.     Plaintiff provided Magnus' estimate and the 2025 Loss Proof of Loss to Defendant via email dated October 22, 2025.

80.     Via letter dated January 8, 2026, Defendant denied Plaintiff's claim for the 2025 Loss and refused to issue any payment.

81.     Based on Magnus' estimate of $1,625,173.81 less the Second Policy's $146,880.00 deductible, the damages attributable to the 2025 Loss amount to at least $1,478,293.81.

82.     Plaintiff also asked Mr. Justin Willits of Mavin Consulting to provide an estimate of the amount of loss from the 2025 Loss.

83.     Mr. Willits issued an estimate using date of loss pricing, and based on the corrective actions provided by Mr. Prosser, to perform the necessary work to repair/replace the damages from the 2025 Loss in the amount of $1,032,992.47 (replacement cost value) and $914,245.14 (actual cash value).

84.     The Willits 2025 Loss estimate does not include the metal roofing system, gable end louvers, or overhead doors.

85.     As pricing increases over time due to inflation (among other factors), the amount of the replacement cost for said corrective actions may increase.

86.     Plaintiff cannot make the necessary repairs/replacement without the insurance benefits, and Defendant's refusal to issue payment for same has prevented Plaintiff from making the necessary repairs/replacement.

The 2025 Loss Caused Distinct Damage

87.    The 2024 Loss and the 2025 Loss caused distinct and separately identifiable damage to the Insured Premises as discussed above and set forth in the Prosser Reports.

88.    The primary damage from the 2024 Loss was to the flood coat of the BUR roofing system, requiring only removal and replacement of that flood coat, along with damage to parapet caps, metal appurtenances, flue caps, small metal roofing system, and downspouts. The 2024 Loss did not cause punctures and openings to the BUR roofing system, and there was no water intrusion into the roofing system associated with the 2024 Loss.

89.    By contrast, the 2025 Loss caused distinct and more severe damage to the roofing system, including punctures and openings into the BUR roofing system and wind-caused uplifting and disengagement of the modified bitumen on the parapet walls. These damages were not caused by the 2024 Loss, were not present during inspections done after the 20242 Loss, and were present after the 2025 Loss.  They are also distinguishable from the flood coat damage caused by the 2024 Loss.

90.    Plaintiff's licensed professional engineer, Steve Prosser, P.E., inspected the Insured Premises following both the 2024 Loss and the 2025 Loss. Mr. Prosser's December 1, 2025 report, which was prepared after the 2025 Loss, documented damage patterns, impact marks, and structural compromise that were not present in his assessment conducted after the 2024 Loss (but before the 2025 Loss).

91.    Mr. Prosser distinguishes between the damage caused by the 2024 Loss and the new, additional damage caused by the 2025 Loss. For instance, Mr. Prosser's test square inspection and analysis demonstrates the additional and distinct damage caused by the 2025 Loss; Mr. Prosser found between 15 and 18 new hail strikes from the 2025 Loss in his test squares that damaged the

14

BUR roofing system, which were not present at his prior inspection (pre-2025 Loss) and that penetrated the flood coat and damaged the plies of the BUR roofing system. In addition, the 2025 Loss caused distinct hail and wind damage to the modified bitumen on the parapet cap of the Insured Premises. Finally, the damage from the 2025 Loss was so severe that the Insured Premises suffered water intrusion into the roofing system and into the interiors—all damage that was not present before the 2025 Loss.

92.    The damage requiring "removing and replacing the roofing system down to the deck" is specifically attributable to the 2025 Loss.

93.    By contrast, the 2024 Loss required only required the replacement of the flood coat to repair the BUR roofing system and did not necessitate full system replacement down to the deck.

94.    Additionally, the damage from the 2025 Loss to the BUR roofing system was so severe that water intrusion into the roofing system and interior of the Insured Premises occurred.

95.    Defendant's own engineering consultant, Nederveld Forensic Engineering, confirmed in its October 8, 2025 report that hail had "recently fallen" at the Insured Premises and that hail of up to 1.25 inches may have impacted the Insured Premises during the Second Policy period on May 19, 2025. This confirmation of a significant hail event supports Plaintiff's position that the 2025 storm caused additional damage.

96.    The damages sought for the 2024 Loss ($297,341.71) represent the cost of flood coat repair and ancillary repairs necessitated by that event. The damages sought for the 2025 Loss ($1,478,293.81) represent the cost of full roof system replacement necessitated by the more severe damage caused by that later event. These damages are not duplicative; they reflect distinct repair scopes for distinct damage caused by separate covered occurrences.

15

97.     Plaintiff advised Defendant of this before filing its lawsuit related to the 2025 Loss, writing that the damage from the 2025 Loss was more severe than the 2024 Loss and that the scope of damage exceeds that of the claim associated with the 2024 Loss.  Plaintiff further advised Defendant that "it is not the intention of your insured to recover twice for the same damage. Rather, your insured seeks only to be fairly compensated for the total damage sustained."

98.     Defendant's failure and refusal to pay for both Losses is a material breach of the Policies and is without justification.

## COUNT I

### Breach of Contract (2024 Loss – First Policy)

99.     Plaintiff incorporates by reference all of the above paragraphs as if fully set forth herein.

100.    The First Policy issued by Defendant to Plaintiff is a binding contract and is supported by valid consideration.

101.    It is Defendant's duty to pay the amounts due under the First Policy for the covered 2024 Loss, including the cost of all necessary repairs and/or replacements.

102.    Defendant is in material breach of the First Policy, and Defendant is liable to Plaintiff in the maximum amount allowed by the First Policy for the 2024 Loss. Specifically, Defendant breached its contract with Plaintiff by its failure and refusal to fully and promptly pay the amounts owed to Plaintiff as a result of the 2024 Loss and as required by the terms of the First Policy.

103.    As a result of Defendant's breach of contract, Plaintiff sustained substantial compensable losses for the amounts claimed under the First Policy, including but not limited to, the amounts owed pursuant to the First Policy for the damage to the Insured Premises and all other

16

amounts to which Plaintiff is contractually entitled, as well as consequential damages, plus interest thereon.

104.    Defendant's actions and breaches have further caused Plaintiff great and substantial harm due to the fact that Plaintiff has been unable to repair and/or replace the damage caused by the 2024 Loss as a result of the financial hardship unduly placed upon it as a direct and proximate result of Defendant's failure to pay Plaintiff the proper amounts, as required by the First Policy.

105.    By reason of Defendant's breach, Plaintiff has been deprived of the benefits due and owing under the First Policy.

106.    Defendant is liable to Plaintiff for its 2024 Loss.

107.    As a direct and proximate result of Defendant's breach of the terms of the First Policy, Plaintiff has suffered and continues to suffer damages, at a minimum, of $297,341.71 (calculated as $317,085.28 in replacement cost value, less the $5,000.00 deductible and less the $14,743.57 partial payment).

**WHEREFORE**, Plaintiff prays this Court enter an award against Defendant with respect to the 2024 Loss for: compensatory damages, consequential damages, pre-judgment interest, costs of this action, specific performance, and such other and further relief this Court may deem just and proper.

## COUNT II
### Breach of Contract (2025 Loss – Second Policy)

108.    Plaintiff incorporates by reference all of the above paragraphs as if fully set forth herein.

109.    The Second Policy issued by Defendant to Plaintiff is a binding contract and is supported by valid consideration.

17

110. It is Defendant's duty to pay the amounts due under the Second Policy for the covered 2025 Loss, including the cost of all necessary repairs and/or replacements.

111. The 2024 Loss and the 2025 Loss are separate and distinct loss events that occurred during separate policy periods and caused separately identifiable damage, as set forth in detail in the paragraphs above.

112. Defendant is in material breach of the Second Policy, and Defendant is liable to Plaintiff in the maximum amount allowed by the Second Policy for the 2025 Loss. Specifically, Defendant breached its contract with Plaintiff by its failure and refusal to pay any amounts owed to Plaintiff as a result of the 2025 Loss and as required by the terms of the Second Policy.

113. As a result of Defendant's breach of contract, Plaintiff sustained substantial compensable losses for the amounts claimed under the Second Policy, including but not limited to, the amounts owed pursuant to the Second Policy for the damage to the Insured Premises from the 2025 Loss and all other amounts to which Plaintiff is contractually entitled, as well as consequential damages, plus interest thereon.

114. Defendant's actions and breaches have further caused Plaintiff great and substantial harm due to the fact that Plaintiff has been unable to repair and/or replace the damage caused by the 2025 Loss as a result of the financial hardship unduly placed upon it as a direct and proximate result of Defendant's failure to pay Plaintiff the proper amounts for the 2025 Loss, as required by the Second Policy.

115. By reason of Defendant's breach, Plaintiff has been deprived of the benefits due and owing under the Second Policy.

116. Defendant is liable to Plaintiff for its 2025 Loss.

117.    As a direct and proximate result of Defendant's breach of the terms of the Second Policy, Plaintiff has suffered and continues to suffer damages, at a minimum, of $1,478,293.81 (calculated as $1,625,173.81 in replacement cost value, less the $146,880.00 deductible).

118.    To the extent, however, there is duplication in any award to Plaintiff, appropriate credit should be given to Defendant, as Plaintiff does not seek a double recovery for any items damaged in the 2024 Loss and the 2025 Loss.  For example, the scope and cost of the repairs to the BUR roofing system from the 2025 Loss exceed the scope and cost of the damages BUR roofing system from the 2024 Loss.

**WHEREFORE**, Plaintiff prays this Court enter an award against Defendant with respect to the 2025 Loss for: compensatory damages, consequential damages, pre-judgment interest, costs of this action, specific performance, and such other and further relief this Court may deem just and proper.

## COUNT III

### Vexatious Refusal To Pay (2024 Loss) – Mo. Rev. Stat. § 375.420

119.    Plaintiff incorporates by reference all of the above paragraphs as if fully set forth herein.

120.    Hail and wind damage is covered by the First Policy.

121.    The exclusions and limitations contained within the First Policy do not preclude coverage for hail and wind damage to the Insured Premises.

122.    Plaintiff fulfilled all duties after the 2024 Loss were imposed upon it by the First Policy to the satisfaction of Defendant.

123.    All conditions precedent to obtaining payment of benefits under the First Policy have been complied with, met, waived by Defendant, or otherwise satisfied.

124.    Despite the significant, undeniable, and obvious storm damage to the Insured Premises from the 2024 Loss, and despite Plaintiff being at no fault in this matter, Defendant has wrongfully refused to pay Plaintiff's claim in full, in contravention of the express terms and conditions of the First Policy, as well as Missouri law.

125.    With respect to the 2024 Loss, Defendant issued only a partial payment of $14,743.57, which is grossly inadequate given the $317,085.28 replacement cost value, at a minimum, documented by Plaintiff's experts.

126.    Pursuant to the First Policy's terms, Defendant is obligated to pay Plaintiff for the Loss it suffered. Defendant has breached—and continues to breach—its obligations to Plaintiff by failing and refusing to tender to Plaintiff the insurance benefits due and owing under the First Policy and by failing to compensate Plaintiff fully for the 2024 Loss.

127.    Defendant's failure and refusal to fully pay for the 2024 Loss is without reasonable cause or excuse, and there is no reasonable coverage dispute concerning the 2024 Loss.

128.    Defendant's failure and refusal to pay for the 2024 Loss a material breach of the First Policy and is without justification.

129.    Despite proper demand for payment of the coverage provided under the terms of the First Policy, Defendant has failed, neglected, and refused to make full payment to Plaintiff under, and in accordance with, the terms and provisions of the First Policy.

130.    Defendant's refusal to pay the full amount owed under the First Policy was willful and without reasonable cause or excuse. The following specific facts demonstrate that Defendant's conduct was vexatious:

    a.    Defendant's own engineering consultant, Nederveld, confirmed in its August 6, 2024 report that hail of 1.0 inches or greater impacted the Insured Premises

20

during the term of the First Policy, yet Defendant issued only a partial payment grossly inadequate to address the documented damage.

b.    Defendant retained three separate inspection firms (Apex, Nederveld, and Aggregate) to examine the Insured Premises, yet still refused to acknowledge the full extent of damage documented by Plaintiff's licensed professional engineer. These companies obtained photographic evidence of the condition of the Insured Premises after the 2024 Loss on behalf of Defendant and provided same to Defendant.

c.    After Plaintiff provided Mr. Prosser's engineering report and Mr. Willits' detailed estimate on March 18, 2025, Defendant failed to respond at all, ignoring Plaintiff's documented claim for over $317,000 in damages.

d.    Defendant's estimate of $31,879.79 in replacement cost value (from which it paid only $14,743.57 in actual cash value) was less than 10% of the $317,085.28 documented by Plaintiff's experts, demonstrating that Defendant's valuation was unreasonable and unsupported by the evidence.

e.    Defendant failed to provide any reasonable or accurate explanation for its refusal to pay Plaintiff's claim in full, despite having documentation from Plaintiff's licensed professional engineer.

f.    Defendant misrepresented to Plaintiff the coverage available under the First Policy for hail damage because the presence of wear and tear, deterioration, etc., does not exclude coverage for hail damage, which was open and obvious to the BUR roofing system after the 2024 Loss during the inspections that were performed on behalf of Defendant.

21

g.      Defendant failed to provide its appointed representatives who performed inspections on its behalf an accurate definition of what constitutes hail damage under the First Policy and failed to instruct that the presence of wear and tear, deterioration, etc., do not serve to exclude coverage for hail damage under the First Policy.

131.    Unlike a situation where an insurer relies on a good-faith dispute over the existence of damage, Defendant acknowledged that the 2024 Loss caused covered damage and issued a partial payment, but then, refused to engage with Plaintiff's expert documentation showing the full extent of that damage.

132.    Defendant's refusal to pay Plaintiff the amounts due and owing under the First Policy is vexatious and without reasonable cause or excuse. Plaintiff is entitled to the relief and remedies provided under Mo. Rev. Stat. § 375.420, including additional damages from Defendant in the amount of twenty percent (20%) of the first fifteen hundred dollars ($1,500) of the loss, ten percent (10%) of the amount of the loss in excess of fifteen hundred dollars ($1,500), and a reasonable attorney's fee.

**WHEREFORE**, Plaintiff prays this Court enter an award against Defendant for vexatious damages for the 2024 Loss to be calculated pursuant to Mo. Rev. Stat. § 375.420, including a reasonable attorney's fee, and such other further relief this Court may deem just and proper.

## COUNT IV

### Vexatious Refusal To Pay (2025 Loss) – Mo. Rev. Stat. § 375.420

133.    Plaintiff incorporates by reference all of the above paragraphs as if fully set forth herein.

134.    Hail and wind damage is covered by the Second Policy.

135.    The exclusions and limitations contained within the Second Policy do not preclude coverage for hail and wind damage to the Insured Premises.

136.    Plaintiff fulfilled all duties after the 2025 Loss were imposed upon it by the Second Policy to the satisfaction of Defendant.

137.    All conditions precedent to obtaining payment of benefits under the Policies have been complied with, met, waived by Defendant, or otherwise satisfied.

138.    Despite the significant, undeniable, and obvious storm damage to the Insured Premises from the 2025 Loss, and despite Plaintiff being at no fault in either matter, Defendant has wrongfully refused to pay Plaintiff's claims for the 2025 Loss in full, in contravention of the express terms and conditions of the Second Policy, well as Missouri law.

139.    With respect to the 2025 Loss, Defendant denied Plaintiff's claim in its entirety and refused to issue any payment despite confirmation from Defendant's own engineering consultant that a significant hailstorm occurred at the Insured Premises during the Second Policy period.

140.    Pursuant to the Second Policy's terms, Defendant is obligated to pay Plaintiff for the losses it suffered. Defendant has breached—and continues to breach—its obligations to Plaintiff by failing and refusing to tender to Plaintiff the insurance benefits due and owing under the Second Policy and by failing to compensate Plaintiff for the 2025 Loss.

141.    Defendant's failure and refusal to fully pay for the 2025 Loss is without reasonable cause or excuse, and there is no reasonable coverage dispute concerning the 2025 Loss.

142.    Photographic evidence of the separate and distinct damage from the 2024 Loss and the 2025 Loss exists and is in possession of Defendant.  These photographs were in the possession of Defendant at the time that its claim decisions were made with regard to the issues in this litigation.  Based on this evidence alone, there is no good faith bona fide dispute as to whether

Defendant owes Plaintiff substantial additional insurance proceeds. Moreover, based upon this evidence, neither a subjective nor an objective reasonable belief exists that substantial additional insurance proceeds are not owed to Plaintiff.

143. Defendant's failure and refusal to pay for the 2025 Loss a material breach of the Second Policy and is without justification.

144. Despite proper demand for payment of the coverage provided under the terms of the Second Policy, including the submission of a Sworn Statement in Proof of Loss, Defendant has failed, neglected, and refused to make any payment to Plaintiff under and in accordance with the terms and provisions of the Second Policy.

145. Defendant's refusal to pay any amount under the Second Policy was willful and without reasonable cause or excuse. The following specific facts demonstrate that Defendant's conduct was vexatious:

a. Defendant's own engineering consultant, Nederveld, confirmed in both its October 8, 2025 Initial Report and its December 16, 2025 Supplemental Report that hail of up to 1.25 inches fell at the Insured Premises on May 19, 2025, during the term of the Second Policy. Despite this confirmation of a significant hail event, Defendant denied Plaintiff's claim in its entirety.

b. Nederveld's conclusion that the roof was not damaged by the 2025 storm is inconsistent with its own confirmation that 1.25-inch hail—a size known to cause significant damage to roofing systems—impacted the Insured Premises. A reasonable insurer would not have relied on such an internally inconsistent opinion to deny a claim in its entirety.

c.   Defendant possessed information demonstrating the 2025 Loss was a separate and distinct event from the 2024 Loss, including Nederveld's confirmation of the May 19, 2025 hailstorm, yet Defendant used the existence of the prior claim as a pretext to deny the 2025 claim rather than properly investigating the obvious damage caused by the 2025 storm.

d.   Defendant failed to retain an independent expert to assess the damage specifically attributable to the 2025 Loss, instead relying on Nederveld's blanket denial that ignored the physical evidence of new damage documented by Plaintiff's engineer.

e.   The opinion of Plaintiff's licensed professional engineer, Steve Prosser, P.E., directly contradicted Nederveld's conclusion. A reasonable insurer faced with conflicting expert opinions regarding a claim of this magnitude ($1.6 million) would have undertaken additional investigation or negotiated in good faith rather than issuing a blanket denial.

f.   Defendant failed to provide any payment—not even the amounts Defendant's own consultant acknowledged might be owed—choosing instead to deny the claim in its entirety without reasonable justification, even though its own experts' photographic evidence demonstrated the new, distinct, and obvious damage resulting from the 2025 Loss. As such, there was no reasonable dispute that the damage from the 2025 Loss was covered under the Second Policy, yet Defendant unlawfully refused to issue any payment to Plaintiff whatsoever.

g.   Defendant misrepresented to Plaintiff the coverage available under the Second Policy for hail damage because the presence of wear and tear, deterioration, etc., does not exclude coverage for hail damage, which was open and obvious to the

BUR roofing system after the 2025 Loss during the inspections that were performed on behalf of Defendant.

h.   Defendant failed to provide its appointed representatives who performed inspections on its behalf an accurate definition of what constitutes hail damage under the Second Policy and failed to instruct that the presence of wear and tear, deterioration, etc., do not serve to exclude coverage for hail damage under the Second Policy.

146.   The existence of competing expert opinions does not automatically establish "reasonable cause" sufficient to defeat a vexatious refusal claim where, as here, the insurer's own expert confirmed the occurrence of a covered peril, and the insurer failed to engage in good-faith investigation or negotiation.

147.   Defendant's refusal to pay Plaintiff any amounts under the Second Policy is vexatious and without reasonable cause or excuse. Plaintiff is entitled to the relief and remedies provided under Mo. Rev. Stat. § 375.420, including additional damages from Defendant in the amount of twenty percent (20%) of the first fifteen hundred dollars ($1,500) of the loss, ten percent (10%) of the amount of the loss in excess of fifteen hundred dollars ($1,500), and a reasonable attorney's fee.

**WHEREFORE**, Plaintiff prays this Court enter an award against Defendant for vexatious damages for the 2025 Loss to be calculated pursuant to Mo. Rev. Stat. § 375.420, including a reasonable attorney's fee, and such other further relief this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury.

26

Dated: <u>4/23/2026</u>                     **McWHERTER SCOTT & BOBBITT, PLC**

s/Clinton H. Scott
CLINTON H. SCOTT
(MO Bar #71257)
54 Exeter Rd., Ste. D
Jackson, Tennessee 38305
Telephone: (731) 664-1340
Facsimile: (731) 664-1540
clint@msb.law

**THE WINTERS LAW GROUP, LLC**

DOUGLAS J. WINTERS
(MO Bar #65284)
7700 Bonhomme Ave., Ste. 575
St. Louis, Missouri 63105
Tel (314) 499-5200
Fax (314) 499-5201
dwinters@winterslg.com

*Attorneys for Plaintiff*